UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| AMBER L. TRITCH, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **CAUSE NO. 1:20-cv-00331-SLC** |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, *sued as Kilolo Kijakazi,* | ) | |
| *Acting Commissioner of Social Security* | ) | |
| *Administration,*[1] | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Amber L. Tritch appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application under the Social Security Act (the "Act") for Supplemental Security Income ("SSI"). (ECF 1). Because one of Tritch's two arguments is persuasive, the Commissioner's decision will be REVERSED and the case REMANDED for further proceedings in accordance with this Opinion and Order.

## I. FACTUAL AND PROCEDURAL HISTORY

Tritch applied for SSI in March 2018 alleging disability as of March 4, 2018. (ECF 17 Administrative Record ("AR") 217). Her claim was denied initially and upon reconsideration. (AR 15, 138-56). On November 21, 2019, administrative law judge ("ALJ") Terry Miller conducted an administrative hearing at which Tritch, who was represented by counsel; Tritch's husband; and a vocational expert testified. (AR 34-106). On December 3, 2019, the ALJ rendered an unfavorable decision to Tritch, concluding that she was not disabled because she

---

[1] Kilolo Kijakazi is now the Acting Commissioner of Social Security, *see, e.g.*, *Butler v. Kijakazi*, 4 F.4th 498 (7th Cir. 2021), and thus, she is automatically substituted for Andrew Saul in this case, see Fed. R. Civ. P. 25(d).

could perform a significant number of unskilled, light exertional jobs in the national economy despite the limitations caused by her impairments.  (AR 15-29).  The Appeals Council denied Tritch's request for review (AR 1-6), at which point the ALJ's decision became the final decision of the Commissioner.  *See* 20 C.F.R. § 416.1481.

Tritch filed a complaint with this Court on September 18, 2020, seeking relief from the Commissioner's decision.  (ECF 1).  In her appeal, Tritch alleges that a remand is necessary because the ALJ failed to account for all of her physical and mental limitations when crafting the residual functional capacity ("RFC").  (ECF 20 at 8).

At the time of the ALJ's decision, Tritch was almost thirty years old (AR 217); had an eleventh grade education (AR 236); and had worked nineteen jobs in the past sixteen years, including as a cashier in retail and a housekeeper at a hotel and nursing home (AR 224-26, 236).  None of these jobs, however, constituted past relevant work.  (AR 27).  In her application, Tritch alleged disability due to bilateral carpel tunnel syndrome, "partially deaf in right ear [and] going deaf in left ear," post traumatic stress disorder (PTSD), "anger issues," anxiety, and depression.  (AR 235).  She was also diagnosed with bipolar and obsessive-compulsive disorders.  (AR 540).

## II.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . , with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005)

2

(citation omitted).  The decision will be reversed "only if [it is] not supported by substantial evidence or if the ALJ applied an erroneous legal standard."  *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (citation omitted).

To determine if substantial evidence exists, the Court "review[s] the entire administrative record, but do[es] not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner."  *Id.* (citations omitted).  "Rather, if the findings of the Commissioner . . . are supported by substantial evidence, they are conclusive."  *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003) (citation omitted).  "In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether [the claimant] is disabled, we must affirm the ALJ's decision denying benefits."  *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

### III.  ANALYSIS

#### *A.  The Law*

Under the Act, a claimant is entitled to SSI if she establishes that she "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).  A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence:  (1) whether the claimant is

currently unemployed in substantial gainful activity; (2) whether she has a severe impairment; (3) whether her impairment or combination of impairments meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. Part 404, Subpart P, App'x 1; (4) whether the claimant is unable to perform her past work; and (5) whether she is incapable of performing work in the national economy.[2]  *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001) (citations omitted); 20 C.F.R. § 416.920.  An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled.  *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (citation omitted).  A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled.  *Id.* (citation omitted).  The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner.  *Clifford*, 227 F.3d at 868 (citation omitted).

### B.  The Commissioner's Final Decision

On December 3, 2019, the ALJ issued a decision that ultimately became the Commissioner's final decision.  (AR 15-29).  At step one, the ALJ concluded that Tritch had not engaged in substantial gainful activity after her application date of March 17, 2018.  (AR 17).  At step two, the ALJ found that Tritch had the following severe impairments:  history of ear pain with otitis/otalgia problems and some hearing loss, bilateral carpal tunnel syndrome, moderate depression/bipolar I disorder, PTSD, anxiety disorder, and obsessive-compulsive disorder.  (AR 18).  At step three, the ALJ concluded that Tritch did not have an impairment or combination of impairments severe enough to meet or equal a listing.  (*Id.*).

---

[2] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite her limitations.  20 C.F.R §§ 416.920(e), 416.945(a).  The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of.  20 C.F.R. § 416.920(e).

Before proceeding to step four, the ALJ determined that Tritch's symptom testimony was not entirely consistent with the medical evidence and other evidence of record.  (AR 21).  The ALJ assigned Tritch the following RFC:

> [T]he claimant has the [RFC] to perform light work as defined in 20 CFR 416.967(b) except only occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; never climbing ladders, ropes, or scaffolds; only frequent bilateral handling and fingering; only work requiring frequent hearing; needs to avoid concentrated exposure to loud noise and hazards, including operational control of dangerous moving machinery, unprotected heights, slippery/uneven/moving surfaces.  Mentally, the claimant can work in a low stress job, defined as one that requires only occasional work-related decisions and involves only occasional changes in the work setting; work that does not require satisfaction of strict or rigid production quotas or does not involve assembly-line pace work; only occasional and short conversations with the public; no concentrated exposure to intense or critical supervision; is best suited to working alone, in semi-isolation from others or as part of a small group; and only occasional tandem work with others.

(AR 20).

Tritch had no past relevant work to consider at step four.  (AR 27).  At step five, the ALJ concluded that Tritch could perform a significant number of unskilled, light-exertional jobs in the national economy, including routing clerk, retail marker, and officer helper.  (AR 28).  Therefore, Tritch's application for SSI was denied.  (AR 29).

### C.  The Assigned RFC

Tritch contends that the ALJ failed to adequately account for all of her physical and mental limitations when assigning the RFC.  The RFC is "the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis," meaning eight hours a day, for five days a week.  SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (second emphasis omitted).  That is, the "RFC is not the *least* an individual can do despite his or her limitations or restrictions, but the *most*."  *Id.* at *1; *see also Young v. Barnhart*,

362 F.3d 995, 1000-01 (7th Cir. 2004); 20 C.F.R. § 416.945(a)(1).

> The [RFC] assessment is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence.

SSR 96-5p, 1996 WL 374183, at *5 (July 2, 1996); *see* 20 C.F.R. § 416.945(a)(3). When determining the RFC, the ALJ must consider all medically determinable impairments, mental and physical, even those that are non-severe. 20 C.F.R. § 416.945(a)(2); *see also Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008).

"[T]he expression of a claimant's RFC need not be articulated function-by-function; a narrative discussion of a claimant's symptoms and medical source opinions is sufficient." *Knox v. Astrue*, 327 F. App'x 652, 657 (7th Cir. 2009) (citations omitted) (finding that the ALJ "satisfied the [RFC] discussion requirements by analyzing the objective medical evidence, [the claimant's] testimony (and credibility), and other evidence"). "The ALJ need not provide a written evaluation of every piece of evidence, but need only 'minimally articulate' his reasoning so as to connect the evidence to his conclusions." *Id.* at 657-58 (citing omitted); *see also Catchings v. Astrue*, 769 F. Supp. 2d 1137, 1146 (N.D. Ill. 2011).

   1. Physical RFC

      *a. Hearing Disorder*

To begin, Tritch argues that the ALJ failed to adequately account for her hearing disorder when assigning the physical RFC. (ECF 20 at 22-24). Tritch asserts that she is "partially deaf in the left ear and going deaf in the right ear," was diagnosed with "[c]onductive hearing loss of the left ear," and has a history of significant ear infections. (*Id.* at 22 (citing AR 48, 442, 446)). She

testified that she can hear monotones but that making out words is difficult, that she has been reading lips since childhood, and that her ears hurt "[w]hen they get wet and [in] wind." (AR 48, 78). While she concedes that her hearing loss "is not in itself disabling" (ECF 20 at 23), she asserts the ALJ failed to adequately account for its effect in combination with her other ailments when limiting her to "only work requiring frequent hearing" and no "concentrated exposure to loud noise and hazards" (AR 20).

In assigning these restrictions, the ALJ considered the evidence of record concerning Tritch's hearing disorder, penning almost an entire page on the matter. He noted that Tritch went to the emergency room in April 2018 with complaints of ear pain that started a few hours earlier. (AR 27 (citing AR 360)). She was diagnosed with left otitis externa, prescribed medication for one week, and instructed to follow up with her primary care physician as needed. (AR 362). She saw Dr. James Ingram, her primary care physician, a week later for bilateral ear pain. (AR 27 (citing AR 375)). Dr. James considered this a "new problem," noting her past medical history of chronic ear infection. (AR 375). He diagnosed her with recurrent acute suppurative otitis media of the right ear without spontaneous rupture of the tympanic membrane, and acute diffuse otitis externa of the left ear. (AR 377). He prescribed additional medication for ten days. (*Id.*).

The ALJ also considered that a June 2018 audiogram showed mild hearing loss, with one hundred percent word recognition on the right at fifty decibels and ninety six percent on the left. (AR 27 (citing AR 445)). Dr. Michael Disher at Indiana Ear opined that Tritch had "mild" sensorineural hearing loss that "may limit some hearing environments," and that she may occasionally have more difficulties with eustachian tube dysfunction exacerbations. (AR 444;

*see also* AR 442).  In September 2018, Tritch returned to Dr. Disher for complaints of mild, intermittent tinnitus and aural fullness (a "[p]lugged feeling") in her left ear.  (AR 27 (citing AR 441)).  He diagnosed her with acute serous otitis media of the left ear and ordered a Z-Pak to resolve the "mild inner ear infection."  (AR 443).

After summarizing the foregoing medical evidence concerning Tritch's hearing disorder—in particular, Dr. Disher's opinion that Tritch may have limitations in some hearing environments—the ALJ concluded that the assigned RFC requiring only "frequent hearing" and no concentrated exposure to loud noise "fully accommodated" Tritch's hearing limitations.  (AR 27).  The ALJ observed that aside from the evidence noted above, "the record appears to reflect normal ear examinations during the period at issue."  (*Id.* (citing AR 406, 409, 414, 418, 433, 484-85, 492-93, 496-97, 502-03, 510-11, 514, 516)).

Moreover, Tritch has not identified any evidence that shows her hearing disorder, whether individually or in combination with her other impairments, causes her any greater limitations  than as accounted for in the RFC.  *See Steward v. Colvin*, No. 13-cv-4595, 2015 WL 1116815, at *9 (N.D. Ill. Mar. 10, 2015) (rejecting the claimant's argument where she "offer[ed] no guidance to the court about how her impairments ought to be considered 'in combination,'" and even if she had, the ALJ adequately discussed each impairment and considered the combination of impairments).  "It is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove [her] claim of disability."  *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) (citing 20 C.F.R. § 404.1512(c); *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987)); *see also Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004) ("[T]he primary responsibility for producing medical evidence demonstrating the severity of

impairments remains with the claimant." (citing 20 C.F.R. § 416.912(c))).  Consequently, Tritch's challenge to the physical RFC based on her hearing disorder is unavailing.

### b. Carpal Tunnel Syndrome

Tritch also argues that the ALJ failed to adequately account in the physical RFC for her handling and fingering limitations arising from bilateral carpal tunnel syndrome.  To review, the ALJ limited Tritch in the RFC to "only frequent bilateral handling and fingering."  (AR 20).  "Frequent" means "occurring from one-third to two-thirds of the time."  SSR 83-10, 1983 WL 31251, at *6 (Jan. 1, 1983); *see also Konda D. v. Saul*, 421 F. Supp. 3d 599, 610 (N.D. Ind. 2019).

Tritch testified that due to bilateral carpal tunnel syndrome she can grab things but only for a short time and often drops them, and that performing certain household chores, driving, and coloring all cause her wrist pain if done for more than a short time.  (AR 41, 51-52, 72, 75).  Tritch further testified that while she enjoys golf cart rides with her children, riding horses, and riding four-wheelers, it has been years since she has been able to perform these activities.  (AR 75).  She was also instructed to wear wrist splints.  (AR 50).  Tritch argues that  given the splints she wears at night and her "regular and constant pain in the wrists," it is unlikely that she would be able to handle and finger items up to two-thirds of an eight-hour workday as the ALJ concluded.  (ECF 20 at 23).

In assigning limitations, the ALJ considered Tritch's complaints arising from her carpal tunnel syndrome and the medical evidence associated therewith.  The ALJ observed that in May 2018, a consultative examination by Dr. Stephen Parker recorded diminished sensation in the right first three fingers but otherwise normal sensation, and normal grip and upper extremity

strength, muscle stretch and tone, and range of motion.  (AR 25-26 (citing AR 383-86)).  Tritch could repetitively use either hand to pick up a coin, button a shirt, zip a zipper, tie shoes, open a jar, pick up keys, write with a pencil grip, grasp objects, and shake hands.  (*Id.* (citing AR 384)).

The ALJ noted that Tritch did not seek treatment for carpal tunnel syndrome until November 2018.  (AR 25).  At that time, Tritch was evaluated by Dr. Micah Smith for a two-year history of bilateral wrist pain, greater on the right than left.  (AR 26 (citing AR 453)).  Tritch had tenderness in the palmer area of her hands and positive Phalen's and Tinel's test bilaterally, but normal strength and range of motion.  (AR 455-56).  A Finkelstein's test was negative bilaterally.  (*Id.*).  Dr. Smith administered bilateral carpal tunnel injections and ordered an EMG, which revealed moderate to severe carpal tunnel syndrome on the right and severe carpal tunnel syndrome on the left.  (AR 457, 467).  Dr. Smith instructed Tritch to take over-the-counter anti-inflammatory medication as needed and to wear wrist splints at night.  (AR 457).

Eight months later, in July 2019, Tritch went to the emergency room with complaints that her left wrist pain had worsened in the past hour and was radiating to her fourth and fifth fingers as a tingling sensation.  (AR 26 (citing AR 509)).  She had some tenderness in her left wrist, but no swelling and her wrist range of motion was normal bilaterally.  (AR 511).

The ALJ in considering this evidence explained his reasoning for assigning the relevant limitations in the RFC:

> The undersigned has fully considered the limitations and restrictions imposed by carpal tunnel syndrome, which are fully accommodated within the [RFC] . . . that limits the claimant to light work to prevent the exacerbation of pain from lifting at greater exertional levels, and fully accommodates any numbness/tingling that may be present through the limitations of avoiding unprotected heights and operational control of dangerous moving machinery, as well as never climbing ladders, ropes, or scaffolds, with only frequent bilateral handling and fingering, as defined, for the safety of the claimant and others.

> The State Agency reconsideration determination that limits the claimant to light work with occasional postural maneuvers as well as avoiding concentrated exposure to hazards is more consistent with the record than the initial determination that found only nonexertional environmental limitations.
>
> Both opinions are persuasive to the extent that the evidence discussed above, including the abnormal EMG, sufficiently support limiting the claimant's exposure to hazards due to carpal tunnel syndrome; however, the undersigned also adopts limiting the claimant to a restricted range of light exertion, as opined upon reconsideration, given the July 2019 emergency department visit for left wrist pain, and even further restricts the claimant to never climbing ladders, ropes, or scaffolds as well as frequent bilateral handling and fingering.

(AR 26 (internal citations omitted)).  Additionally, earlier in his decision, the ALJ indicated that the "production limitation" in the RFC ("work that does not require satisfaction of strict or rigid production quotas or does not involve assembly-line pace work" (AR 20)) also "fully accommodates any limitations resulting from carpal tunnel syndrome."  (AR 25).

As stated earlier, Tritch argues that it is "unlikely" a person who wears wrist splints and experiences pain from carpal tunnel syndrome "would be able to handle and finger as often as the ALJ assumes."  (ECF 20 at 23).  But to reiterate, "[t]he claimant bears the burden of submitting medical evidence establishing her impairments and her residual functional capacity." *Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir 2011) (citations omitted).  Here, Tritch has not pointed to any medical source opinion of record assigning her greater upper extremity limitations than those crafted by the ALJ in the RFC.  *See, e.g.*, *Harris v. Kijakazi*, No. 20-cv-639-jdp, 2021 WL 3124207, at *3 (W.D. Wis. July 23, 2021) (rejecting the claimant's argument that her carpal tunnel syndrome warranted greater limitations, observing that the claimant "cites no authority to suggest that severe carpal tunnel syndrome requires a greater restriction than the ALJ ascribed to her").  Furthermore, as one district court recently observed, "ALJs often include frequent handling and fingering limitations in the RFCs of claimants with severe carpal tunnel

11

syndrome." *Id.* (collecting cases).

Moreover, at the time Tritch first sought treatment from Dr. Smith, she had not been taking any medication for her carpal tunnel syndrome or wearing wrist splints, and there is no evidence that she followed up with Dr. Smith for additional care after receiving the wrist injections in November 2018.  When she did seek care from the emergency room eight months later, she reported wrist pain "over the past [one hour]" after cleaning the house, denied any loss of sensation or weakness, admitted she wore her night wrist splint only occasionally, and had not taken any medication for the condition.  (AR 509); *see Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009) (discounting the severity of a claimant's complaints where his treatment was "'relatively conservative' and inconsistent with [his] complaints").

For these reasons, Tritch fails to show that a remand of her physical RFC is warranted based on her carpal tunnel syndrome.  Rather, the ALJ's crafting of upper extremity limitations in the RFC is supported by substantial evidence.

2.  <u>Mental Limitations</u>

Tritch also challenges the mental RFC assigned by the ALJ.  She contends that the ALJ erred by:  (1) "cherry-picking" the medical records and basing the mental RFC only on her "good days"; and (2) failing to consider if she is capable of full-time work given her unsuccessful employment history.  (ECF 20 at 10-21).  Ultimately, Tritch's arguments challenging the mental RFC are persuasive, at least in part, warranting a remand of the Commissioner's final decision.

a.  *Cherry-Picking the Medical Evidence*

Tritch argues that the ALJ failed to consider her mental health record as a whole when

12

assigning her mental RFC, and instead cherry-picked medical records that reflect only her "good days." (*Id.* at 10). In support, she cites *Punzio v. Astrue*, in which the claimant suffered from severe depression with suicidal ideation and bipolar disorder. (*Id.* (citing *Punzio*, 630 F.3d at 705-07)). There, the ALJ surmised that Punzio's condition "improved over the years, that she no longer is suicidal, that her symptoms typically persist only a few hours, and that she is 'managing activities of daily living without significant difficulty.'" *Punzio*, 630 F.3d at 712. The Seventh Circuit Court of Appeals, however, found that the ALJ "cherry-picked" the medical records to locate a single treatment note to support this outcome, emphasizing that while Punzio may have had a few "good days," such evidence failed to fairly reflect the overall record and was insufficient to support the ALJ's conclusion that Punzio could maintain full-time employment. *Id.* at 710-11 ("[T]he ALJ demonstrated a fundamental, but regrettably all-too-common, misunderstanding of mental illness . . . . As we have explained before, a person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about her overall condition.").

Here too, the ALJ concluded based on the evidence that Tritch improved with mental health treatment and could perform full-time employment. In doing so, the ALJ summarized:

> Although the claimant was briefly hospitalized on an inpatient basis in August 2019 for suicidal ideations[,] it appears she improved with treatment, and . . . the record seems to suggest that the claimant's mental status remained fairly stable over multiple examinations during the period at issue, even though she did not receive consistent outpatient mental health treatment throughout the entire period at issue in this decision.

(AR 19 (internal citations omitted); *see also* AR 22).

The ALJ penned a lengthy summary of the medical evidence pertaining to Tritch's mental health. He observed that Tritch was referred to a psychiatrist in March 2017 by her

13

family care practitioner due to complaints of anhedonia, anxious mood, insomnia, decreased appetite, crying spells, decreased concentration, fatigue, guilt, sadness, feelings of worthlessness, and anger.  (AR 22 (citing AR 379-82)).  She was not taking any medications at the time.  (AR 379).  At her first appointment, Tritch reported that she was experiencing mood swings, depression, and anxiety such that she would sits for hours alone, did not want to get out of bed, often had crying spells, lost interest in things, did not eat at times, and did not sleep for days. (AR 325).  At a subsequent appointment, she presented as "distressed," with a sad mood and labile affect, but no suicidal ideation or violent thoughts.  (AR 325-32).

The ALJ assessed that the "April and May 2017 therapy treatment notes tend to reflect some improvement" in that "although [Tritch] was depressed, she was also calm and by May 2017, she noted her medication helped her anxiety a little bit."  (AR 22).  The April 2017 visit indicates that Tritch rated her depression as an "eight" on a ten-point scale (with ten being the worst).  (AR 327).  A mental status exam revealed that she was cooperative and calm with appropriate judgment, coherent thought process, and no suicidal ideation; but an anxious mood, paranoid thought content, attention and concentration problems, limited insight, and deficits in her remote memory.  (AR 330-31).  She was diagnosed with a major depressive disorder, moderate, recurrent episode, with anxious distress; PTSD; and a generalized anxiety disorder. (AR 332).

A month later, in May 2017, Tritch reported that her medication was "helping her anxiety a little . . . [but she still had] random mood swings throughout the day."  (AR 321).  She relayed that she was "not so moody when she awakens," that she soon was going to work as a cleaning person, and that she had plans to start her own cleaning company one day.  (*Id.*).  A mental status

exam was unchanged except for suicidal ideation and normal attention, concentration, and memory.  (AR 353-54).  In June 2017, Tritch reported an increase in her depression and anxiety in the afternoons, rating her depression as a "seven."  (AR 343).  A mental status exam revealed an anxious and depressed mood; normal attention, concentration, and memory; but no suicidal ideation.  (AR 346-47).  In August 2017, Tritch reported that she was sleeping well but that her depression felt worse, rating it a "nine."  (AR 335).  A mental status exam was unchanged other than a depressed mood.  (AR 338-39).  The Northeastern Center discharged Tritch in November 2017 because she did not return after her August medication management appointment, documenting that her chart was "being closed as unsuccessful."  (AR 315).

The ALJ further observed that Tritch did not return for mental health treatment during the next year-and-a-half and that assessments in the interim for physical disorders revealed normal mental health findings.  (AR 23).  More particularly, the ALJ noted that an emergency room visit in December 2017 did not address her mental status, and an emergency room visit in March 2018 reflected that her mood, affect, behavior, judgment, and thought content were within normal limits.  (Id. (citing AR 405-410)).  In April 2018, she visited the emergency room twice, which similarly reflected that she was in no apparent distress and was well-appearing with a normal mood and affect.  (Id. (citing AR 361-62, 412-18)).  Dr. Ingram also indicated in April 2018 that Tritch was "negative" for decreased concentration or sleep disturbance.  (AR 375).  A June 2018 emergency room visit likewise indicated that Tritch was not in distress.  (AR 418).  And in September 2018, Dr. Ingram wrote that Tritch was "not feeling nervous; not depressed; [and] not feeling more tired in morning than evening."  (AR 441).

The ALJ also discussed the opinion of Andrew Miller, Psy.D., HSPP, who examined

Tritch in June 2018 at the request of the Social Security Administration.  (AR 24 (citing AR 389-92)).  Tritch told Dr. Miller that she was taking Abilify and Zoloft, that the medications were helpful but made her tired, and that she was able to manage her medications on her own.  (AR 390).  On mental status exam, Dr. Miller noted that Tritch was cooperative with a depressed mood and tearful affect; had sufficient persistence, concentration, and insight; good memory for task instructions; slightly below average frustration tolerance; and slight difficulty in social interactions.  (AR 391-92).  She stated that she spent her days caring for her two young children, getting them ready for school, performing household tasks, getting her children ready for bed, and then making a fire and sitting outside to relax.  (AR 391).  Dr. Miller stated:

> Ms. Tritch's daily routines do not appear to be well established.  She needs some support from others to accomplish her daily tasks.  Her daily activities appear to be complicated.  Her ability to sustain these efforts on a daily basis appears to be impaired; however, she is still able to manage her household.

(AR 392).  Dr. Miller indicated that if disability benefits were awarded, Tritch would be able to manage them independently.  (*Id.*).

The ALJ also considered that Tritch returned to the Northeastern Center for mental health care in January 2019 for complaints of sleep and appetite disturbances, two to three "bad days" a week where she stays in bed, "bad" anxiety, crying spells, no motivation, mood swings, and "OCD like cleaning."  (AR 24 (citing AR 575-83)).  The following month, Tritch reported that she had multiple personalities, suicidal thoughts, was hearing voices, and was cutting herself.  (AR 584-85).  She rated her depression as an "eight."  (*Id.*)  A mental status exam revealed that Tritch was cooperative, had an anxious and depressed mood, coherent and goal-directed thought process, obsessive thought content, normal memory, poor judgment, limited insight, and suicidal thoughts.  (AR 588-89).  Her diagnoses remained unchanged, and she was prescribed various

medications.  (AR 590).  Tritch, however, failed to return for any further appointments, and in May 2019, the Northeastern Center discharged her, recommending that she "return to services when she feels ready to engage in more than medication management."  (AR 575).

The ALJ also noted that an April 2019 emergency room visit for a physical problem reflected that Tritch had a normal mood and affect.  (AR 25 (citing AR 517)).  Similarly, July 2019 emergency room visits indicated that Tritch was in no distress and was "negative" for decreased concentration and sleep disturbance.  (*Id.* (citing AR 501-03, 509-12)).  And another emergency room visit on August 1, 2019, stated that she had a normal mood, behavior, and affect, but appeared distressed.  (*Id.* (citing AR 493, 497)).

However, as the ALJ discussed, on August 19, 2019, Tritch was hospitalized at the Northeastern Center after she went off her medications for two days, became angry in a fight with her boyfriend, and attempted suicide by walking into traffic.  (AR 21-22 (citing AR 529-43)).  She reported that she quit mental health treatment previously because she forgot appointments and forgot to take her medications.  (AR 531, 533, 537, 539-40).  She reported a history of cutting herself and attempting suicide by placing a knife to her throat.  (AR 537, 540).  Upon discharge three days later, Tritch had "improved a lot . . . . was not sad or suicidal, not hopeless and helpless, was sleeping and eating good . . . . and [was] not suicidal or homicidal." (AR 557).  She was cooperative, had a normal mood and congruent affect, normal thought content and coherent thought process, normal attention and concentration, appropriate judgment, but limited insight and some deficits in her recent memory due to a past traumatic brain injury. (AR 556).  She reported that her medications were helpful and that her moods were balanced. (AR 540-41).  She was diagnosed with bipolar I disorder and obsessive-compulsive disorder,

with good or fair insight.  (AR 540).

After reviewing the medical evidence pertaining to Tritch's mental health, the ALJ surmised that "[e]ven in 2019, leading up to the August hospitalization, it appears that [Tritch] functioned fairly well."  (AR 24).  He reiterated that after her brief mental health treatment in 2017, she "did not return to outpatient mental health treatment until January 2019 . . . ."  (*Id.*).  As such, the ALJ concluded that "the record does not tend to reflect the degree of mental limitations alleged by [Tritch] at the hearing."  (AR 22).  He elaborated that "although [she] was hospitalized on an inpatient basis for psychiatric purposes in August 2019 and received some outpatient mental health treatment in 2017 and early 2019 through the Northeastern Center, the mental status examinations tend to reflect she remained fairly stable throughout the period at issue."  (*Id.*).  The ALJ further explained that limiting Tritch's social interactions in the RFC would "avoid social stressors that would aggravate [her] symptoms," and that limiting her to unskilled work without strict or rigid production quotas or assembly-line pace work would accommodate the combination of her mental disorders, "even though the record does not consistently reflect examples of distractibility observed by providers over multiple examinations throughout the period at issue . . . ."  (AR 25).

As stated earlier, Tritch argues that in assigning these limitations the ALJ erred by cherry-picking the medical evidence, "spen[ding] more time discussing the positive things . . . than the many negative and concerning notes prevalent throughout the visit records."  (ECF 20 at 12-13 (citation omitted)).  To illustrate her point, Tritch cites to her various statements made to providers about her mood swings, history of cutting and suicidal thoughts, nightmares, hearing voices, staying in bed all day, crying spells, and loss of appetite, accusing the ALJ of ignoring

this evidence.  (*Id.* at 13-14 (citing AR 328, 516, 540, 578-79, 584-85)).  However, the ALJ did discuss Tritch's mood swings, history of suicidal thoughts, nightmares, her claim of multiple personalities and hearing voices, staying in bed all day, crying spells, and loss of appetite.  (*See* AR 25-29).  In any event, "an ALJ need not mention every snippet of evidence in the record . . . ."  *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012).  Rather, "the ALJ must connect the evidence to the conclusion; [and] in so doing, he may not ignore entire lines of contrary evidence."  *Id.* (collecting cases).

In an effort to show the ALJ ignored an entire line of contrary evidence, Tritch contends the ALJ cherry-picked the Northeastern Center's discharge note of May 2019 by stating it "reflects [Tritch] stopped engaging with the Northeastern Center after her medication evaluation, and her chart was closed."  (AR 25 (citing AR 576)).  She criticizes the ALJ for omitting the Northeastern Center's recommendation that she "return to services when she feels ready to engage in more than medication management."  (AR 575).  Contrary to Tritch's assertion, this recommendation by the Northeastern Center does not rise to the level of a contrary line of evidence.

Tritch also argues that the ALJ improperly concluded "that [she] was somehow improving and no longer in need of [mental health] services . . . ."  (ECF 20 at 13 (citing AR 25)).  This argument, too, is a nonstarter.  While the ALJ did conclude that Tritch improved with mental health treatment in 2017, he never stated or inferred that such improvement meant she was no longer in need of mental health services.  (*See* AR 19, 22-24).

Finally, Tritch argues that the ALJ cherry-picked Dr. Miller's medical source statement. This argument has more traction.  To review, Dr. Miller evaluated Tritch in June 2018 at the request of the Social Security Administration, and he was the only examining mental health

provider of record to issue a medical source statement.  (AR 389-92).  The ALJ penned four

paragraphs on Dr. Miller's examination findings, noting his statement that Tritch's "daily

routines did not appear to be well-established and appeared complicated."  (AR 28 (citing AR

392)).  However, as Tritch asserts, the ALJ omitted the portion of Dr. Miller's medical source

statement opining that she "needs some support from others to accomplish daily tasks" and that

"[h]er ability to sustain these efforts on a daily basis appears to be impaired," both of which

undercut the ALJ's conclusion that Tritch could sustain full-time employment.  (ECF 20 at 12

(citing AR 392)).

Given that Dr. Miller's opinion is the only medical source statement from an examining

mental health doctor, and the ALJ wrote four paragraphs on it, the Court concludes that the ALJ

materially erred by omitting this portion of Dr. Miller's opinion.  Evidence reflecting that Tritch

requires assistance to perform her daily tasks and that her ability to sustain tasks is impaired

constitutes an entire line of evidence contrary to the ALJ's conclusion that Tritch could

independently sustain full-time competitive employment.  Therefore, the ALJ erred by failing to

address this portion of Dr. Miller's medical source statement.  *See Farrell v. Astrue*, 692 F.3d

767, 773 (7th Cir. 2012) ("Farrell's RFC should not have been measured exclusively by her best

days; when a patient like Farrell is only unpredictably able to function in a normal work

environment, the resulting intermittent attendance normally precludes the possibility of holding

down a steady job.  Matters would be different if the ALJ had confronted Dr. Beyer's opinions

and had explained why he was rejecting them.  But he did not." (internal citation omitted)).  This

conclusion segue's into Tritch's additional argument challenging the mental RFC—that the ALJ

failed to adequately consider her unsuccessful employment history.  As discussed below,

20

Tritch's second argument only bolsters the Court's conclusion that a remand is necessary to reconsider Dr. Miller's opinion and the mental RFC.

        b. *Capacity for Full-Time Employment*

Tritch contends that the ALJ "inappropriately failed to consider if [she] was capable of maintaining a full-time job." (ECF 20 at 21). She argues that she "has made efforts to work, but her efforts have always been thwarted by her mental illnesses." (*Id.*). She asserts that she has had approximately nineteen jobs each lasting from a few days to a few months, "most of which have been lost due to psychological problems." (ECF 20 at 17 (citing AR 87, 224-26); *see also* AR 236).

  Tritch testified that she has "anger issues," "low periods" of depression, and nightmares or flashbacks, all which cause her at least seven "bad days" a month where she stays in bed all day. (AR 53, 55-56, 85, 90-91). She also testified that she has memory problems in that she forgets to take her medications, bounces from task to task, and was fired from a job for forgetting to set an alarm.[3] (AR 57, 63, 81, 88-89, 92; *see also* AR 531)). Tritch contends that her "bad days," anger issues, and memory problems would result in absenteeism that is preclusive of full-time employment, given the vocational expert's testimony that competitive employment allows no absences in the first ninety days of employment and no more than three absences a month

---

[3] The ALJ considered Tritch's symptom testimony (and that of her husband) about the severity of her anger issues, memory problems, and "bad days," but found that her statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the medical evidence and other evidence of record. (AR 21). Tritch does not directly challenge the ALJ's assessment of the credibility of her symptom testimony, and thus, she has waived that argument. *See Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived . . . ." (citation omitted)); *Swanson v. Apfel*, No. IP 99-1159-C H/G, 2000 WL 1206587, at *4 (S.D. Ind. Aug. 7, 2000) (deeming arguments waived by the claimant's failure to raise them in her opening brief). Having said that, the ALJ's finding implies that Tritch's symptom testimony was credible at least in part, and thus, could still result in some absenteeism and impact her ability to sustain competitive employment.

thereafter.  (ECF 20 at 20; *see* AR 97).  Here, the ALJ noted that Tritch's most recent job ended because she called off sick and then walked off the job the next day, and that she "raised her voice and threatened the manager" at another job.  (AR 21).  But he did not discuss the sheer number of jobs—nineteen jobs in sixteen years—Tritch attempted but has failed to sustain.  (*See* AR 224-26, 236).

Furthermore, while the ALJ assessed that Tritch "improved" during the relevant period (AR 23), the ALJ "did not explain how improvement, without more, equates to the ability to work full time," *Daniel W. v. Saul*, No. 19 C 1684, 2020 WL 3469217, at *3 (N.D. Ill. June 25, 2020).  "[T]here can be a great distance between a patient who responds to treatment and one who is able to enter the workforce."  *Meuser v. Colvin*, 838 F.3d 905, 913 (7th Cir. 2016) (citation omitted); *see also Murphy v. Colvin*, 759 F.3d 811, 819 (7th Cir. 2014) ("Simply because one is characterized as 'stable' or 'improving' does not necessarily mean that she is capable of [full-time]. . . work."); *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011) ("Those notes show that although Scott had improved with treatment, she nevertheless continued to frequently experience bouts of crying and feelings of paranoia.  The ALJ was not permitted to 'cherry-pick' from those mixed results to support a denial of benefits."); *Catherine D. v. Berryhill*, No. 18-cv-3262, 2019 WL 1468145, at *4 (N.D. Ill. Apr. 3, 2019) ("[A] doctor's report that a condition is 'stable' or 'improving' or a patient's self-report of feeling 'fine' do not necessarily mean a plaintiff is able to work." (collecting cases)); *Diaz v. Berryhill*, No. 15 C 11386, 2017 WL 497768, at *5 (N.D. Ill. Feb.7, 2017) ("Even if Mr. Diaz's improvement with treatment is supported by the record, it would not be conclusive of Mr. Diaz's ability to work.").

Tritch also emphasizes there is evidence of missed treatment appointments, asserting that because she continually missed treatment appointments she would similarly be absent from work

due to her mental illness.  (ECF 20 at 19).  Indeed, a record showing frequent missed

appointments can translate into frequent absenteeism from work.  *See, e.g.*, *Punzio*, 630 F.3d at

711; *Reeder v. Astrue*, No. 1:11-CV-00141, 2012 WL 928738, at *13 (N.D. Ind. Mar. 19, 2012).

Here, the record contains evidence of missed treatment appointments (AR 531), but the ALJ did

not address this evidence as a potential predictor of Tritch's absenteeism.

In sum, by cherry-picking Dr. Miller's medical source statement and by failing to discuss

Tritch's unsuccessful employment history and frequent missed appointments, the ALJ ignored an

entire line of evidence contrary to his conclusion that Tritch could independently sustain full-

time competitive employment.  Therefore, the case will be remanded to further assess this

evidence and its impact on the mental RFC.

### IV.  CONCLUSION

For the foregoing reasons, the Commissioner's decision is REVERSED, and the case is

REMANDED to the Commissioner for further proceedings in accordance with this Opinion and

Order.  The Clerk is DIRECTED to enter a judgment in favor of Tritch and against the

Commissioner.

SO ORDERED.

Entered this 28th day of September 2021.

/s/ Susan Collins
Susan Collins
United States Magistrate Judge

23